IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JASON STONE,                          )      Civil No. 05-1120-JE
                                      )
                  Plaintiff,          )
                                      )
           v.                         )      FINDINGS AND
                                      )      RECOMMENDATION
JO ANNE B. BARNHARDT, COMMISSIONER    )
OF SOCIAL SECURITY,                   )
                                      )
                  Defendant.          )
_____)

        Rex Q. Smith
        Attorney at Law
        P.O. Box 757
        Lake Oswego, OR 97034
             Attorney for Plaintiff

        Karin J. Immergut
        U.S. Attorney
        Neil J. Evans
        Asst. U.S. Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, OR 97204

        Jeffrey Baird
        Special Asst. U.S. Attorney
        Social Security Administration
        701 5th Avenue, Suite 2900 M/S 901
        Seattle, WA 98104-7075
             Attorneys for Defendant

FINDINGS AND RECOMMENDATION - 1

JELDERKS, Magistrate Judge:

Plaintiff Jason Stone brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI) pursuant to 42 U.S.C. §§ 416 and 423. The Commissioner's decision should be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on February 21, 1997. After the applications were denied initially and on reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

On August 19, 1998, a hearing was held before ALJ Joel Elliott. Plaintiff, represented by his current attorney, testified. Plaintiff's mother, sister, and girlfriend, and a Vocational Expert (VE) also testified. In a decision dated December 17, 1998, ALJ Elliot found that plaintiff was not disabled within the meaning of the Social Security Act (the Act) because he could perform jobs that existed in substantial numbers in the national economy.

In an Order dated May 3, 2000, the Appeals Council granted plaintiff's timely request for Review of ALJ Elliot's decision. The Appeals Council vacated ALJ Elliot's decision,

based on his failure to evaluate the opinion of Craig Redfern, D.O., plaintiff's treating physician.  In addition, plaintiff had submitted evidence which suggested to the Appeals Council that plaintiff had a psychotic disorder.  In remanding the action, the Appeals Council noted that plaintiff had filed a second application for SSI benefits on July 9, 1999, which had been forwarded to the Appeals Council.  The Appeals Council instructed the ALJ to issue a new decision on both of plaintiff's SSI claims.

On remand, plaintiff's applications were again assigned to ALJ Elliot.

Represented by his current counsel, plaintiff appeared and testified at a second hearing, which was held on September 27, 2000.  Lawrence Cohen, M.D., and John Crossen, Ph.D., appeared at the hearing as medical Experts (ME's).  Russell Cater, a VE, also testified.

In a decision dated February 1, 2001, ALJ Elliot found plaintiff was not disabled within the meaning of the Act because he could work as a garment sorter, a hand packager, or a laundry sorter.  That decision became the final decision of the Commissioner on August 17, 2001, when the Appeals Council denied plaintiff's request for review.

Plaintiff appealed the Commissioner's denial of his applications to the United States District Court for the District of Oregon.  In an Order dated May 28, 2002, the Court

noted that the parties had stipulated that the case be
reversed and remanded for further proceedings.  The Court
ordered the ALJ to, on remand

> further develop the record, conduct a new hearing,
> and issue a new decision which fully addresses the
> opinions of the treating and reviewing physicians,
> the testimony of any lay witnesses, and fully
> address the Plaintiff's residual functional
> capacity.

In an Order dated October 15, 2002, the Appeals Council
vacated the final decision of the Commissioner and remanded
the case for further consideration by an ALJ.  In its order of
remand, the Appeals Council instructed the ALJ to whom the
case was assigned to "update the medical record to the extent
possible [and] obtain supplemental vocational expert testimony
at a new hearing with hypothetical questions including all of
the claimant's limitations."  The Appeals Council further
stated that the ALJ "may wish to obtain medical expert
testimony to assist him in considering the expanded record and
determining the extent of the claimant's GAF scores and any
mental impairment and its affect on the claimant's ability to
perform sustained work activity."  Finally, based on the
"expanded record," the ALJ was instructed to "issue a new
decision, fully addressing the opinions of the treating and
reviewing physicians, the testimony of any lay witnesses, and
fully assessing the claimant's residual functional capacity."

On remand, this action was first assigned to ALJ Joseph
Schloss, who conducted hearings on March 17, 2003, and

July 12, 2003.  At the conclusion of the second hearing, ALJ
Schloss stated that he had concluded that plaintiff's
"treating doctor has made him a drug addict and is violating
the law by doing so . . . ."  ALJ Schloss granted plaintiff's
request that he recuse himself, and the case was reassigned to
ALJ Thomas Tielens.

A hearing was held before ALJ Tielens on November 12,
2003.  Plaintiff; Carolyn Stone, plaintiff's mother; Wanjera
Washington, plaintiff's girlfriend; and Paul Morrison, a VE;
testified at the hearing.

In a decision dated March 29, 2004, ALJ Tielens found
that plaintiff was not disabled within the meaning of the Act.
That decision became the final decision of the Commissioner on
May 19, 2005, when the Appeals Council denied plaintiff's
timely request for review.  Plaintiff challenges that decision
in the present action.

## FACTUAL BACKGROUND

Plaintiff was born on January 31, 1974, and was 30 years
old at the time of the hearing before ALJ Tielens.  He
completed high school and two years of college, and has past
relevant work experience as a United Parcel Service (UPS)
worker, a warehouse worker, and a bartender/bouncer.
Plaintiff alleges that he became disabled as of May 31, 1995,
because of fibromyalgia with pain, fatigue, sensitivity to

light, dizziness, nausea, headaches, concentration and memory problems, and a herniated disc.  He has not engaged in substantial gainful activity since the date of his alleged onset of disability, and met the requirements for DIB coverage through June 30, 1997.

## MEDICAL RECORD

The portions of plaintiff's medical record that are relevant to the review of the underlying decision are thoroughly set out in the ALJ's decision, which is summarized below.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the
claimant has one or more severe impairments.  A claimant who
does not have such an impairment is not disabled.  If the
claimant has a severe impairment, the Commissioner proceeds to
evaluate claimant's case under Step Three.  20 C.F.R.
§ 404.1520(c).

Step Three.  Disability cannot be based solely on a
severe impairment; therefore, the Commissioner next determines
whether the claimant's impairment "meets or equals" one of the
impairments listed in the SSA regulations, 20 C.F.R. Part 404,
Subpart P, Appendix 1.  A claimant who has such an impairment
is disabled.  If the claimant's impairment does not meet or
equal one listed in the regulations, the Commissioner's
evaluation of the claimant's case proceeds under Step Four.
20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the
claimant is able to perform work he or she has done in the
past.  A claimant who can perform past relevant work is not
disabled.  If the claimant demonstrates he or she cannot do
work performed in the past, the Commissioner's evaluation of
the claimant's case proceeds under Step Five.  20 C.F.R.
§ 404.1520(e).

Step Five.  The Commissioner determines whether the
claimant is able to do any other work.  A claimant who cannot
perform other work is disabled.  If the Commissioner finds

that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## ALJ'S DECISION

ALJ Tielens concluded that plaintiff "has severe mental impairments."  This conclusion was based in part on a consultative examination performed by Luke Patrick, Ph.D., in September 2003, which the ALJ found provided the "best medical summation and analysis" of plaintiff's mental problems.  He noted that Dr. Patrick diagnosed "a pain disorder associated primarily with psychological factors and rule out an

undifferentiated somatoform disorder (Ex. 23F-12)." The ALJ
noted that Dr. Patrick also "diagnosed rule out cannabis
abuse, opioid dependence, and rule out personality disorder
NOS, with prominent Cluster B traits and notations of
dependent and hypochondrial personality features.
(Ex. 23F-12)."

The ALJ concluded that the existence of a pain disorder
with psychological factors and a somatorform disorder was best
explained as follows in Dr. Patrick's discussion of
plaintiff's prior medical history:

> Extensive medical records were provided for review.
> A number of consistent themes were noted within
> these records. These included widespread symptom
> reporting by the client, focused on but not limited
> to, chronic pain and fatigue, gastrointestinal
> distress, chronic headache, tremor and inability to
> concentrate. Also notable in the medical records is
> a recurring lack of evidence to account for the
> claimant's complaints." (Emphasis added) (Ex. 23F-
> 2).

ALJ Tielens added that Dr. Patrick further concluded "that the
claimant's medical history showed repeated utilization of the
health care system and extreme focus on medical symptoms.
(Ex. 23F)."

In addition to Dr. Patrick's report, the ALJ cited a
psychological review performed by Sharon Labs, Ph.D., in
April 2002, which "found diagnoses of a pain disorder with
psychological factors and general medical condition and rule
out somatization disorder (Ex. 18F-5)"; a report dated May 30,
2000, which diagnosed "a pain disorder with psychological

factors and general medical condition and rule out
somatization disorder (Ex. 19F)"; an evaluation by
James Bryan, Ph.D., in August 1999 which found plaintiff
"to have a pain disorder associated with psychological factors
and general medical condition and a somatization disorder
(Ex. 18F-5)"; a consultative examination by Jane Starbird,
Ph.D., in October, 1997, which "also listed a somatization
disorder (Ex. 13F-3)"; and a diagnosis of "a somatization
disorder with an almost total positive review of systems
(Ex. 12F-2)" made by Peter Bonafede, M.D., who examined
plaintiff in August 1997.

In his review of the medical record, the ALJ noted a
"scarcity of any objective medical findings to support the
claimant's pain allegations," which he found supported "the
conclusion of a pain disorder and a somatoform disorder."
As an example, he cited an examination based upon plaintiff's
complaints of back pain in February 2003 which "led to an
examination that revealed no gross deformity or effusion."
He also cited reports by Craig Redfern, D.O., plaintiff's
treating physician, that plaintiff's "chronic pain was not
consistent with pathoanatomically identified conditions
(Ex. 22F-10)."

Based upon this medical evidence, the ALJ concluded that
plaintiff "has a pain disorder associated primarily with
psychological features and an undifferentiated somaform

disorder and that these impairments are 'severe.'"  Based upon
the review of other medical evidence which he also summarized,
the ALJ further concluded that plaintiff has a personality
disorder which constitutes a severe impairment, but that
plaintiff "failed to establish a dysthymic disorder as a
severe impairment."

The ALJ noted that plaintiff both denied and admitted use
of illicit substances, reporting that he used marijuana for
pain management, and alleging that he "got stuck with dual
diagnosis treatment" because he used narcotic pain medication,
but that he was "discharged from treatment as he did not have
a specific drug dependency problem."  The ALJ further noted
that plaintiff was "very vague about his use of substances,"
citing plaintiff's inability to tell Dr. Patrick how often he
used marijuana, and his admission that he used the drug when
it "was available."  He noted that, though Dr. Patrick
concluded that plaintiff's "narration of his drug history was
not particularly reliable," Dr. Patrick and other physicians
had concluded that "substance abuse is appropriately listed"
as one of plaintiff's diagnoses.  Based upon this evidence,
the ALJ concluded that plaintiff's "substance abuse is a
severe impairment."

In his decision, the ALJ also ultimately concluded that
plaintiff's fibromyalgia is a severe impairment.  He noted,
however, that plaintiff's treating physician reported that

plaintiff's pain was in fact "undoubtedly intimately related to his psychiatric problems," and "was not consistent with pathoanatomically identified conditions (Ex. 22F-10)." The ALJ also noted that plaintiff's treating physician had observed that plaintiff's "chronic spine and limb pain were not entirely consistent with fibromyalgia," and that Kathleen McAuliffe, M.D., reported in March 2002 that, though plaintiff met the criteria for fibromyaligia, "his tenderness of non-test points put the diagnosis in question . . . ."

The ALJ concluded that, though plaintiff's impairments were "severe within the meaning of the Regulations," they were not sufficiently severe to meet or medically equal one of the impairments in the listings. The ALJ observed that fibromyalgia is not a "listed impairment," and concluded that plaintiff's mental impairments "fail to meet a mental listing" and instead resulted in only a "mild restriction of activities of daily living." He observed that plaintiff had mild difficulties in maintaining social functioning, and noted that "[n]o episodes of decompensation of extended duration have been evidenced in the medical record." The ALJ added that, though plaintiff had "marked difficulties in maintaining concentration, persistence and pace" because of the side-effects of his pain medication, "the 'B' criteria has not been fulfilled and none of the mental listings has been met." He

concluded that, whether considered alone or in combination, plaintiff's impairments did not meet or equal the listings.

The ALJ concluded that plaintiff possessed the residual functional capacity to do only light level work, and that his fibromyalgia further restricted him "to work that does not involve constant repetitive use of his hands for fine manipulation and restricts him to occasional kneeling and crawling and crouching." He added that plaintiff "should not climb ladders, scaffolds or ropes," and, because of his use of pain medications, "should avoid hazards of moving machinery and of heights." In addition, the ALJ concluded that plaintiff's mental impairments restricted plaintiff "to occasional interaction with coworkers and supervisors" and precluded contact with the general public.

In evaluating plaintiff's residual functional capacity, the ALJ concluded that plaintiff's testimony was not entirely credible. In support of this conclusion, the ALJ cited contradictions in plaintiff's testimony and statements, conduct that was inconsistent with plaintiff's assertions of his medical condition, and testimony of plaintiff's mother that contradicted plaintiff's testimony. The ALJ also found that plaintiff's "drug-seeking behavior" undercut his allegations of pain, noting that plaintiff had told an examiner in September 2003 that his "bad judgment" led him to end up "in situations where there is a lot of drugs

(Ex. 23F-32)."  He also noted that Dr. Redfern, plaintiff's treating physician, told plaintiff that his "long list of medications was becoming more a problem than a benefit (Ex. 23F-32)."  The ALJ noted that plaintiff admitted that he could function without taking all the medications prescribed for him, but was reluctant to give up any of the medications. He noted that Dr. Redfern observed that plaintiff had "a great investment in his ongoing illnesses," and that discussion of the possibility of "weaning off the medications . . . generally resulted in a great flurry of symptomatology." The ALJ noted that Dr. Redfern had observed that this behavior "is consistent with malingering and/or drug seeking," but had opined that "these are not the primary issues."  The ALJ found that Dr. Redfern had "fail[ed] to provide any reasons for this conclusion," and cited evidence from other sources in the record indicating that plaintiff had a substance abuse problem.

    In concluding that plaintiff retained the functional capacity to perform certain work, the ALJ noted that the results of plaintiff's psychological tests "were rather normal," and that Dr. Patrick had opined that plaintiff "easily possesses the cognitive capability for completion of a variety of competitive job tasks . . . ."  The ALJ also concluded that plaintiff's "description of his day contradicts his allegation of an inability to work," and that "his

activities show a degree of activity and of concentration that belie his claim that he is incapable of work-related activity."

The ALJ noted that, during the hearing, the VE had testified that all of plaintiff's past work required at least a moderate level of physical exertion.  Because he found that plaintiff retained only the functional capacity to perform light work with certain restrictions, the ALJ concluded that plaintiff could not perform any of his past work.

The ALJ noted that plaintiff was defined as a "younger individual" according to the relevant regulations, that he had more than a high school education, and that he had no transferable skills.  Based upon his analysis of plaintiff's residual functional capacity, the ALJ determined that plaintiff "is capable of performing a significant range of light work as defined in 20 CFR §§ 404.1567 and 416.967."  The ALJ also noted that an individual who can perform light work can also perform sedentary work "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods."

At the hearing, the VE testified that an individual with plaintiff's age, education, past relevant work experience, and residual functional capacity would be capable of performing unskilled light work as a parking lot cashier, a construction flagger, and a movie usher.  Responding to a hypothetical

requiring greater isolation from the general public, the VE
testified that the hypothetical individual could perform work
as a laundry folder, a surveillance system monitor, and an
investigator.  Based upon this testimony, the ALJ found that
plaintiff could perform such work.  Based upon the VE's
additional testimony that these positions exist in significant
numbers in the national economy, the ALJ found that plaintiff
is not disabled within the meaning of the Act.

## STANDARD OF REVIEW

A claimant is disabled if he or she is unable "to engage
in substantial gainful activity by reason of any medically
determinable physical or mental impairment which . . . has
lasted or can be expected to last for a continuous period of
not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The
initial burden of proof rests upon the claimant to establish
his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182
(9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The
Commissioner bears the burden of developing the record.
DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's
decision if it is based on proper legal standards and the
findings are supported by substantial evidence in the record
as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala,
53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence

means more than a mere scintilla but less than a
preponderance; it is such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."
Andrews, 53 F.3d at 1039.  The court must weigh all of
the evidence, whether it supports or detracts from the
Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771,
772 (9th Cir. 1986).  The Commissioner's decision must be
upheld, however, even if "the evidence is susceptible to more
than one rational interpretation."  Andrews, 53 F.3d at
1039-40.


                          **DISCUSSION**

     As noted above, the May 28, 2002 Order of Remand required
the ALJ to conduct a new hearing and issue a new decision
fully addressing the opinions of treating and reviewing
physicians and fully addressing plaintiff's residual
functional capacity.  Plaintiff asserts that ALJ Tielens'
decision, which is at issue here, "simply reflects defiance"
of that Order, and that the ALJ erred in failing to
appropriately consider whether plaintiff's impairments prevent
him from working full time in a competitive employment
environment.  Plaintiff further contends that the ALJ erred in
accusing Dr. Redfern, plaintiff's treating physician, of
committing "blatant malpractice on plaintiff by medicating
plaintiff into an inability to work . . . ."  Plaintiff's Mem.

FINDINGS AND RECOMMENDATION - 17

at 10.   Plaintiff also contends that the ALJ erred in failing to discuss in detail plaintiff's assertion that his chronic pain began with an automobile accident that occurred when he was 12 years old, and erred in failing to provide a "detailed discussion of portions of Dr. Redfern's records to support the Chief ALJ's speculation that Dr. Redfern's medical conduct to plaintiff has been below the standard of care for physicians licensed to practice medicine by the Board of Medical Examiners of the State of Oregon."

In addition to these more focused challenges to the ALJ's decision, plaintiff also asserts that, if this court considers remanding his case for further proceedings, it should consider that "[t]he Portland Office of Hearings and Appeals simply has far too many cases to possibly be able to provide due process hearings to Social Security disability claimants."  In support of this assertion, plaintiff asks the court to take judicial notice of information concerning the ALJs' substantial caseloads set out on page 18 of his memorandum, and asserts "that if this action" is remanded with a rebuke to the lower tribunals, an ALJ will conduct a hearing allowing at least a half a day of hearing time, the ALJ will not engage in speculation about plaintiff's disability being the result of protracted medical malpractice by Dr. Redern [sic], and the ALJ will finally address plaintiff's case theory that the 24-7 effects on his functioning from the pain and fatigue

of severe physical and mental biological illness prevent him

from keeping a set work schedule, all with the result that he

will finally get a favorable decision."  Plaintiff asserts

that

> (1) way too many meritorious cases get
> unfavorable decisions at the initial decision and
> reconsideration stages because the DDS decision
> makers never see and hear claimants and the lay
> witnesses who can correlate effects on function to
> each claimant as an individual; (2) the meritorious
> cases that require seeing and hearing witnesses get
> passed along in overwhelming numbers to the Office
> of Hearings and Appeals; (3) as a result of the case
> load, the Office of Hearings and Appeals cannot
> schedule reasonable amounts of time for hearings;
> (4) without a due process opportunity for hearings,
> claimants appeal in large numbers to the Appeals
> Council and the Appeals Council is overwhelmed,
> resulting in affirmances without any serious review;
> (5) claimants then become plaintiffs in Federal
> District Court, where the cases (along with
> immigration cases in some Districts) are simply
> choking the Courts.

1. Due Process

Before turning to plaintiff's other contentions, I will

briefly address plaintiff's contention that, because of the

sheer number of claims filed, claimants are not afforded due

process in the application process.

I have not independently verified that plaintiff has

accurately stated the number of claims filed in the Portland

office.  However, I, like other magistrate and district judges

in this district, am well aware that substantial numbers of

claims are filed, that many claims are denied, that many

claimants whose claims are denied initially subsequently

participate in hearings before an ALJ, and that many social security cases are ultimately filed in this District Court. From reviewing transcripts of administrative hearings, I am also aware that hearings before an ALJ often conclude in an hour or less.

Nevertheless, plaintiff's contention that claimants are not accorded due process is not persuasive.  Plaintiff has cited, and I have found, no reported decisions stating or implying that the administrative system under which plaintiff's claim was reviewed does not afford claimants like plaintiff the due process required by law.  A "presumption of regularity" generally exists concerning government officials' performance of their duties.  See, e.g., Red Top Mercury Mines, 887 F.2d 198, 202-03 (9th Cir. 1989).  Nothing in the record before the court supports the conclusion that, in performing his duties in administering and analyzing plaintiff's case, ALJ Tielens did not act correctly and fairly.  Moreover, plaintiff has cited, and I am aware of, no authority for the proposition that this court has the authority to require that the Social Security Administration provide plaintiff a hearing of any particular duration.  In addition, the 1211 page administrative record before the court supports only the conclusion that plaintiff here has been accorded the due process required by law.  The record indicates that plaintiff's medical record has been thoroughly

reviewed, that plaintiff has participated in several hearings, and that ALJs have analyzed his disability claim in detailed written decisions.  The transcript of the hearing before ALJ Tielens also supports the conclusion that ample time was provided to develop the testimony of plaintiff, lay witnesses, and the VE.  There is simply no basis for concluding that, in the claims review process, plaintiff has been deprived of his right to due process.


2. <u>Contention that ALJ defied remand Order; failed to appropriately consider effects of plaintiff's impairments, and failed to adequately address plaintiff's contentions about the origin of his chronic pain</u>

As noted above, plaintiff contends that ALJ Tielen's decision reflected defiance of the District Court's Order to fully address medical opinions concerning plaintiff's condition and fully address plaintiff's residual functional capacity, and that the ALJ failed to appropriately consider whether plaintiff retained the functional capacity to work full time in a competitive employment environment.

Based upon a careful review of the administrative record and the ALJ's decision, I disagree.  In analyzing plaintiff's residual functional capacity, the ALJ thoroughly reviewed plaintiff's extensive medical record.  In determining that plaintiff could perform light level work with specific

restrictions, the ALJ cited evidence indicating that plaintiff's strength was intact, and evidence that plaintiff could ride a bicycle and participate in community activities. Based upon evidence of possible fibromyalgia, the ALJ restricted plaintiff from repetitive use of hands for fine manipulation.  He also accepted that plaintiff's extensive use of pain medications required restriction on heights and precluded work around moving machinery.  These conclusions were supported by the analyses of plaintiff's physical limitations performed by State Agency physicians, which constituted substantial evidence, as well as by examining medical experts.

In analyzing plaintiff's mental limitations, the ALJ thoroughly reviewed and relied upon the examination performed and comprehensive history taken by Dr. Patrick.  Dr. Patrick had thoroughly reviewed plaintiff's medical records, and noted a consistent lack of objective evidence accounting for plaintiff's reports of symptoms, and secondary gain issues. Because he relied on independent clinical findings and a comprehensive review of the medical record, Dr. Patrick's opinion constituted substantial evidence which the ALJ could consider along with the opinions of plaintiff's treating physician.  See, e.g., Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  In limiting plaintiff to only occasional contact with supervisors and co-workers, and to no contact

with the general public, the ALJ relied upon Dr. Patrick's opinion.  He also relied upon Dr. Patrick's opinion to support his finding that plaintiff was not wholly credible and that he overstated his limitations and symptoms.  The ALJ's reliance on Dr. Patrick's evaluation and conclusions was fully justified.

The ALJ provided specific reasons, which were supported by evidence in the record, for rejecting the opinion of Dr. Redfern, plaintiff's treating physician, regarding plaintiff's residual functional capacity.  The ALJ noted that Dr. Redfern had prescribed substantial pain medications in the absence of an established physical basis for much of the alleged pain, and that Dr. Redfern himself had found that plaintiff's complaints of pain were not consistent with pathoanatomical conditions, and had noted that plaintiff's behavior was consistent with malingering and/or drug seeking. The ALJ also noted that Dr. Redfern had reported that plaintiff's complaints of pain were not consistent with plaintiff's stable appearance during office visits.

The ALJ provided specific and legitimate reasons, which were supported by substantial evidence in the record, for reaching conclusions about plaintiff's residual functional capacity that differed from those of Dr. Redfern. Accordingly, the ALJ's rejection of Dr. Redfern's opinions was legally sufficient.  See, e.g., Magallanes v. Bowen, 881 F.2d

747, 751 (9th Cir. 1989) (ALJ must support rejection of treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record").

Finally, I also disagree with plaintiff's contention that the ALJ erred in failing to discuss in detail plaintiff's contention that he began to experience chronic pain following an automobile accident which occurred when plaintiff was 12 years old.  The ALJ thoroughly reviewed the medical evidence concerning plaintiff's pain.  His conclusion that plaintiff had a pain disorder with psychological factors and a somatoform disorder is supported by substantial evidence in the record, which he cited.  In addition, as noted above, the ALJ concluded that plaintiff's own statements about his pain and medical condition were not wholly credible.  Plaintiff does not challenge that credibility determination.  In determining whether plaintiff is disabled within the meaning of the Act, the critical question was not whether plaintiff began to experience chronic pain at age 12, but whether plaintiff is able to perform work that exists in substantial numbers in the economy.  The ALJ fully supported his conclusion that plaintiff can perform such work, and the Commissioner's decision that plaintiff is not disabled within the meaning of the Act should be affirmed.

## CONCLUSION

Plaintiff's request for an Order remanding this action for an award of benefits or for further proceedings should be DENIED, and a Judgment should be entered dismissing this action with prejudice.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due July 24, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 6th day of July, 2006.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge